### IN THE UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF MISSISSIPPI
### JACKSON DIVISION

**MELISSA J. REID**                                                                      **PLAINTIFF**

**V.**                                                 **CIVIL ACTION NO.  3:10CV237 WHB-LRA**

**MICHAEL J.  ASTRUE,**
**COMMISSIONER OF SOCIAL SECURITY**                                    **DEFENDANT**

### REPORT AND RECOMMENDATION
### OF UNITED STATES MAGISTRATE JUDGE

Melissa Reid has filed a motion for summary judgment appealing the

Administrative Law Judge's decision denying her applications for Disability Insurance

Benefits ("DIB") and Supplemental Security Income ("SSI").  The Commissioner

opposes the motion and requests an order pursuant to 42 U.S.C. § 405(g), affirming the

final decision of the Administrative Law Judge.  Having carefully considered the hearing

transcript, the medical records in evidence, and all the applicable law, the undersigned

recommends that the decision be affirmed.

### Procedural Background

On May 2, 2007, Plaintiff filed applications for DIB and SSI, alleging she became

disabled on October 26, 2006.  The applications were denied initially and on

reconsideration.  She appealed the denial and on May 5, 2009, Administrative Law Judge

Rebecca LaRiccia ("ALJ") rendered an unfavorable decision finding that Plaintiff had not

established disability within the meaning of the Social Security Act.  The Appeals

Council denied Plaintiff's request for review on January 27, 2010.  She now appeals that

decision.

## Facts and Medical Evidence

Plaintiff was born on August 19, 1979, and was 29 years old at her administrative hearing.  She has a ninth grade education, and was enrolled in special education classes in school before withdrawing to get married.  She has two children and has worked as a fast food worker, welder/production line worker, sewing machine operator, waitress, sandwich maker and manager at a Subway restaurant.[1]  On her application for benefits, she alleged disability due to sacroiliac joint dysfunction and arthritis.

The relevant evidence includes employment questionnaires completed by Plaintiff and her former employer; and, medical records from her treating physicians, Dr. John Witcher and Dr. Kenneth Schneider and state agency consultants, Dr. Karen Shackelford and Dr. Thomas Jeffcoat.  The record also reflects treatment from other medical providers at various treatment facilities, including the University of Mississippi Medical Center Pain Management Clinic ("UMC Pain Management Clinic").

In September 2006, Plaintiff was treated at UMC Pain Management Clinic.  She had a history of lower back and hip pain and had been diagnosed with right sacroiliac joint anthropathy.  She received steroid injections on September 6, 2006, with good results and was advised to undergo a weight loss program.  Two weeks later, she reported

---

[1]ECF No. 9-2, pp. 12-22.

that she had been "pain free" since her injections; however, she returned in November 2006 because the pain had returned.  She received another injection and did not return again until January 2007, when she was advised again to lose weight.[2]  Her last clinic visit was in April 2007.

MRI's of Plaintiff's spine taken in March 2006 and July 2007 were both normal. No fractures, dislocation or significant degenerative disc changes were observed in 2006; and no central canal stenosis or neural foraminal narrowing was observed in 2007. Paraspinous soft tissues were also normal.[3]  In March 2007, Plaintiff went to the emergency room with complaints of arm and back pain after falling in Wal-Mart. X-rays taken of her left wrist and forearm were normal.  She was diagnosed with a sprained wrist, prescribed medication, and discharged.[4]  The next month she was treated at a different clinic for pain management due to complaints of chronic low back pain.  By June 2007, her back pain was described as good.[5]

In July 2007, Plaintiff underwent a consultative physical examination by Dr. Shackelford.  In that exam, Plaintiff stated that she had been suffering from arthritis pain in her hips and had been diagnosed with sacroiliitis.  She reported that if she stands or sits

---

[2]ECF No. 9-7, pp. 2-11.

[3]ECF Nos. 9-7, p. 25;  9-8, p. 18.

[4]ECF No. 9-7, pp. 12-29.

[5]ECF No. 9-7, pp.  36-39.

for too long, she feels sharp pain in her lower back and hips.  She described her back pain as "five or worse on a scale of one to ten" hurting "eight to ten hours a day" everyday.  She also rated her hip pain at five out of ten, and stated that some days she cannot stand when she gets out of bed because it is "too hard."  She is unable to do things around the house or run or play with her children, and if she does the dishes or laundry, she has severe back pain and has to sit for several hours.  She also advised that she was laid off work in October 2006 from Subway, and tried to return in March 2007, but was "unable to stand."[6]

Dr. Shackelford observed that Plaintiff was obese at five-feet, five-inches tall and 210 pounds, and though she had difficulty balancing, she was able to heel-toe walk.  Her cervical spine was not tender to palpation but she had limited movement.  Despite a difficult and slow gait, Plaintiff was able to squat 90%, and did not use a cane or walker, though he opined that it could become necessary if the problem progresses.  Plaintiff had almost full strength in her lower extremities and had positive straight leg raises and range of motion in her thoracolumbar spine.  Her neurological examination was normal except for minimal paresthesia on the anterior and lateral aspect of her thighs.  Her psychiatric exam was essentially normal except for situational worries about her physical limitations.  She reported trouble sleeping, but denied any depression or anxiety.  Dr. Shackelford's

---

[6]ECF No. 9-7, pp. 64-67.

diagnostic impression was "severe sacroiliitis, chronic, expected to worsen, with limitation of movement."[7]

Dr. Jeffcoat reviewed Dr. Shackelford's report the following month in August 2007, and concluded that the exam was "relatively normal except [where] claimant felt to exaggerate findings."[8] A few weeks later, Plaintiff returned to her primary care provider with complaints of severe pain in her back and bilateral hips. The provider noted some lumbar spasms, positive heel-toe walking, and that Plaintiff was " . . . trying for disability." She was advised to get her records from the University of Mississippi Medical Center.[9]

In November 2007, Plaintiff began seeing her primary treating physician, Dr. Witcher. During the course of his treatment, Plaintiff was prescribed pain medication and advised to lose weight. She reported the medications helped, but was advised to discontinue her medications in November 2008 because she was pregnant. In February 2009, Dr. Witcher completed a residual functional capacity assessment in which he opined that during an eight-hour workday, Plaintiff could lift and carry ten pounds occasionally; but could stand, walk and sit for no more than two hours; he also reported that she could not sit, stand or walk for more than five minutes at a time before needing

---

[7]ECF No. 9-7, pp. 64-67.

[8]ECF No. 9-7, p. 68.

[9]ECF No. 9-7, pp. 69-72.

to shift positions at will; and that she could never twist, stoop, or crouch and could only occasionally climb stairs.  Plaintiff should avoid extreme temperatures and hazardous work environments due to her limited ability to ambulate and balance, and would need to miss work three times a month.  He also noted that Plaintiff had been treated at UMC Pain Management Clinic, and referred to those records as support for his opinions.[10]

In December 2008, a month after discontinuing her pain medications because of pregnancy, Plaintiff was evaluated by Dr. Schneider, for a "psychological evaluation to assist in determining her eligibility for disability benefits," at the request of counsel. During that exam, Plaintiff told Dr. Schneider that she had severe back pain and spent much of her time in bed.  She also said that she had last worked at a Subway restaurant but had to quit because the pain was "too great to sit, stand, or to focus her attention adequately."  Plaintiff said that she quit school to get married, and he noted that her school records indicated that she was placed in special education classes in school and made "very poor grades."  On the WAIS-III, Plaintiff scored a verbal I.Q. of 65, a performance I.Q. of 64, and a full scale I.Q. score of 62.  Dr. Schneider diagnosed Plaintiff with mild mental retardation secondary to depression.  He noted that she suffers from depression due to chronic pain and limitations, which "negatively affects her motivation" and "would keep her from paying sufficient attention to instructions and in

---

[10]ECF No. 9-8, pp. 5-9.

remembering to follow through." He then went on to conclude that she was entitled to benefits because she was 100% "permanently occupationally disabled" and could not "work in any setting."[11]

### Administrative Hearing Testimony

Plaintiff was 30 weeks (7 ½ months) pregnant at the administrative hearing, and testified that she weighed approximately 218 pounds. She confirmed that she had finished the ninth grade and that all her classes were special education, except for history. Her husband worked construction part-time, and they have two children, ages six and eight. She testified that she has not worked since Subway, which she stopped because she had excruciating pain in her hips and lower back. Her pain is aggravated when she does laundry or the dishes. She also has difficulty walking and feels pain if she walks for more than ten feet, and can only lift five to ten pounds. She testified that she was currently taking over-the-counter Tylenol because she had to discontinue taking her prescription medication during her pregnancy. Though her prescription medications provided only temporary relief, they were more effective than Tylenol. She testified that she last saw her primary physician, Dr. Witcher, to get the "disability papers [she] needed" and to let him know how her health was doing during her pregnancy. She also testified that she has no hobbies, but cooks, shops, drives and cares for her children.[12]

---

[11]ECF No. 9-8, pp. 2-4.

[12]ECF No. 9-2, pp. 46-61.

**Findings of the Administrative Law Judge**

After reviewing all the evidence, the ALJ concluded that Plaintiff was not disabled under the Social Security Act.  At step one of the five-step sequential evaluation,[13] the ALJ found Plaintiff had not engaged in substantial gainful activity since her alleged onset date, October 26, 2006.[14]  At steps two and three, the ALJ found that although Plaintiff had the severe impairments (decreased I.Q. scores, depression, obesity and degenerative disc disease of the right sacroiliac joint), none of these impairments, either alone or in combination, met or medically equaled any listing.  At step four, the ALJ found that Plaintiff could not return to her past relevant work, but has the residual functional capacity to perform light work "limited by her inability to perform more than occasional stooping or bending, her inability to be exposed to temperature extremes or work hazards such as dangerous machinery or unprotected heights, and her inability to remember and carry out more than simple instructions."[15]  Relying on vocational expert testimony, the ALJ concluded at step five, that Plaintiff could perform unskilled jobs in the national and

---

[13]Under C.F.R. § 404.1520, the steps of the sequential evaluation are: (1) Is plaintiff engaged in substantial gainful activity? (2) Does plaintiff have a severe impairment? (3) Does plaintiff's impairment(s) (or combination thereof) meet or equal an impairment listed in 20 C.F.R. Part 404, Sub-part P, Appendix 1? (4) Can plaintiff return to prior relevant work? (5) Is there any work in the national economy that plaintiff can perform?  *See also McQueen v. Apfel*, 168 F.3d 152,154 (5th Cir. 1999).

[14]The ALJ also observed that Plaintiff unsuccessfully attempted to return to work at Subway in 2007 for one week.  The ALJ concluded that because of its short duration, it could not be considered substantial gainful activity as defined in the regulations.

[15]ECF No. 9-2, p. 19.

regional economies such as assembler, house sitter, and silver wrapper.

## Standard of Review

Judicial review in social security appeals is limited to two basic inquiries: "(1) whether there is substantial evidence in the record to support the [ALJ's] decision; and (2) whether the decision comports with relevant legal standards." *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (citing *Carrier v. Sullivan*, 944 F.2d 243, 245 (5th Cir. 1991)). Evidence is substantial if it is "relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)). This Court may not re-weigh the evidence, try the case *de novo*, or substitute its judgment for that of the ALJ, even if it finds evidence that preponderates against the ALJ's decision. *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1994).

## Discussion

Plaintiff argues that the ALJ committed errors at steps three, four and five of the sequential evaluation process. She argues the ALJ (1) failed to properly determine whether her mental retardation met or equaled Listing 12.05(C); (2) failed to properly assess the medical opinions of her treating physicians; (3) failed to properly assess her residual functional capacity; and (4) failed to resolve conflicts between the vocational expert's testimony and the Dictionary of Occupational Titles ("DOT"). The Court finds

that substantial evidence supports the ALJ's findings at every step of the sequential

evaluation, and that the ALJ's decision should be affirmed.

1.      **The ALJ properly determined that Plaintiff did not meet the mental
        retardation listing.**

Plaintiff challenges the ALJ's finding that her mental retardation claim for

disability benefits did not meet or medically equal the requirements of Listing 12.05(C).

To meet this Listing, Plaintiff must show that her condition satisfies both the diagnostic

description of mental retardation outlined in the introductory paragraph of 12.05 and the

severity criteria enumerated in Section (C).  20 C.F.R. pt. 404, subpt. P, app. 1 § 12.05.

The diagnostic description defines mental retardation as "significantly subaverage general

intellectual functioning with deficits in adaptive functioning initially manifested during

the developmental period; i.e., the evidence demonstrates or supports onset of the

impairment before age 22." *Id.*  Section (C) requires a claimant to show intelligence

testing with "a valid verbal, performance, or full scale IQ of 60 though 70 and a physical

or other mental impairment imposing an additional and significant work-related limitation

of function." *Id.*  Thus, to meet Listing 12.05(C), a claimant must show: (1) evidence of

onset of mental retardation (adaptive functioning) before age 22; (2) a valid I.Q. score

between 60-70, (3) and another severe impairment.

The ALJ found that Plaintiff did not meet Listing 12.05(C) because there was no

credible evidence that she had deficits in adaptive functioning prior to age 22.  Plaintiff

argues that this was error because Dr. Schneider's mild mental retardation diagnosis and

her poor performance in special education classes established that she met the adaptive

functioning criteria.  She also points out that Dr. Schneider observed that she had a

learning disability, and that her I.Q. scores were within the Listing range.  An

employment questionnaire completed by her former Subway employer also purportedly

shows that she was unable to tolerate work stress and was afforded "special

accommodations" to work.[16]

Simply having a low I.Q. score is not enough to indicate disabling mental

retardation.[17]  A threshold showing of a significantly subaverage I.Q. score with deficits

in adaptative functioning is also required.  *See Randall v. Astrue*, 570 F.3d 651, 659-60

(5th Cir. 2009).  And even when a claimant's I.Q. scores fall within the Listing range, the

ALJ has the discretion to assess their validity.  *See Muse v. Sullivan*, 925 F.2d 785, 789

(5th Cir. 1991).  The ALJ noted here that Plaintiff's low I.Q. scores were likely "due to

depression and/or medication effects and/or other causes."[18]  This was a reasonable

---

[16]ECF No. 11, p.10.

[17]Although Plaintiff's I.Q. scores were obtained after she turned 22, several courts have
found that a low I.Q. score raises a presumption that significantly subaverage intellectual
functioning manifested before the claimant turned 22.  *See Rowell v. Apfel*, 2000 WL 1449887,
at *5 n.3 (E.D. La. 2000) (citing multiple court opinions that hold that a low I.Q. score raises a
presumption during the developmental period).  The Fifth Circuit has yet to address the issue in a
social security case, but it has considered the issue  in other contexts.  *See Morris v. Dretke*, 413
F.3d 484, 487 (5th Cir. 2005) (considering I.Q. scores obtained after the defendant turned 18 in
analyzing whether he had manifested significantly subaverage intellectual functioning before
18).

[18]ECF No. 9-2, p. 17.

assessment given that Plaintiff had just discontinued her pain medications before Dr. Schneider tested her I.Q., and he opined that her pain negatively affected her motivation and prevented her from paying sufficient attention to instructions. Still, the ALJ did not merely disregard Plaintiff's low I.Q. scores. She found they were a severe impairment at step two that limited her to routine, repetitive, simple tasks.

Dr. Schneider also diagnosed Plaintiff with mild mental retardation and depression, but as noted by the ALJ, "the evidence from Dr. Schneider is a one-time-only examination and takes all of the claimant's statements at face value." While Dr. Schneider reports that Plaintiff "made very poor grades, even in Special Education courses," her school records reflect that she made mostly A's and B's in the ninth grade, and that her lowest grade was in a regular world history class.[19] Plaintiff also told Dr. Schneider that she resigned from Subway because her arthritis pain was "too great to sit, stand, or to focus her attention adequately," not because her mental incapacity interfered with her ability to work as Dr. Schneider suggests. In any event, the Court notes that both explanations contradict the one given by her former Subway employer - that she quit because her "husband came home from jail." In this regard, the ALJ was reasonably concerned that "[i]nconsistent statements made by the claimant detract from the probative value of her statements."[20]

---

[19]ECF No. 9-6, p. 35.

[20]ECF No. 9-2, p. 20.

Dr. Schneider also opined that Plaintiff would be unable to work in any work setting, but the record reflects that despite her low I.Q. scores, school performance and academic deficits, Plaintiff was still capable of maintaining employment.  *See Outlaw v. Barnhart*, 197 Fed.App'x.  825, 827 (11th Cir. 2006) (An ALJ may consider a plaintiff's work history as a factor to discount his or her allegation of mental retardation.); *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (noting that claimant was able to work for several years while suffering from impairments she now asserted were disabling).  The record evidence establishes that Plaintiff has previously worked in both unskilled and semi-skilled jobs, including Subway, where she supervised other employees.  On an employment questionnaire, her former Subway employer reports that she could complete work tasks, provided that she did not miss work "for a variety of reasons not related to her health, such as her children being sick or her car not working properly."[21]  She could also understand and remember work instructions; make work-related decisions; maintain concentration, persistence and pace; interact appropriately with co-workers, supervisors, and the public; accept criticism from her supervisor; and, meet productivity standards with accuracy and other work goals.

Contrary to Plaintiff's claims, her former employer expressly states that he did not afford her "special accommodations."  He notes in fact, that she could "maintain an

---

[21]ECF Nos. 9-2, p. 17; 9-6, pp. 22-24.

ordinary work routine without special accommodations."[22]  Though she had trouble handling stress and special considerations such as shorter hours, fewer duties, and more frequent breaks were given, Plaintiff did not require extra assistance and/or supervision, and the productivity and quality of her work never suffered.[23]  When asked to describe her responsibilities at Subway on a disability report, Plaintiff described herself as a "multitasker" who was responsible for running the cash register and the store; preparing and stocking food, performing inventory, sending faxes and doing "everything and anything necessary. . . that needed to be done."[24]  Whatever her reasons for quitting Subway, Plaintiff demonstrated the capacity to work despite her low I.Q. scores and mild mental retardation.  Contrary to Dr. Schneider's findings, the ALJ found no "credible evidence [that her] impairments were of any greater severity when she saw Dr. Schneider than when she was working and quit."[25]

Plaintiff's daily activities were also inconsistent with deficits in adaptive functioning.  She was able to shop, drive, take care of her children and maintain her home, and the limitations she described were attributable to her pain, not her mental

---

[22]ECF No. 9-6, pp. 22-24.

[23] *Id.*

[24]*Id.* at 14-21.

[25]ECF No. 9-2, p. 17.

14

impairments.[26]  *See Arce v. Barnhart,* 185 Fed.App'x 437, 439 (5th Cir. 2006) (finding

substantial evidence that claimant, who was capable of housecleaning, using a computer,

grooming, and getting along with others, but who required help cooking, paying bills,

shopping, riding the bus and caring for her children, did not have deficits in adaptive

functioning and therefore did not meet listing 12.05(C)).

Lastly, Plaintiff argues that the ALJ had an affirmative duty under SSR 96-6p to

obtain an updated medical expert opinion on medical equivalence.  The ALJ expressly

states in her opinion that Plaintiff "does not have any combination of impairments which

are medically equivalent to an impairment listed in Appendix 1."[27]  Moreover, an ALJ is

not required to obtain an updated medical opinion on the issue of equivalency where, as

here, substantial evidence supports the ALJ's finding that the Plaintiff does not meet a

Listing.  So long as sufficient evidence exists, the ALJ has no duty to request additional

evidence.  *See Anderson v. Sullivan*, 887 F.2d 630, 634 (5th Cir. 1989).

Because substantial evidence supports the ALJ's finding that Plaintiff did not

have the requisite deficits in adaptive functioning necessary to satisfy § 12.05(C), no

remand is warranted on this issue.

2.      **The ALJ properly assessed the medical opinions.**

Plaintiff argues the ALJ erred in failing to give controlling weight to the opinions

---

[26]ECF No. 9-2, p. 18.

[27]ECF No. 9-2, p. 18.

of her primary treating physicians, Dr. Schneider and Dr. Witcher.  In this Circuit,

"[g]ood cause may permit an ALJ to discount the weight of a treating physician relative to

other experts where the treating physician's evidence is conclusory, is unsupported by

medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise

unsupported by the evidence." *Newton v. Apfel*, 209 F.3d 448, 455-56 (5th Cir. 2000)

(citation omitted).  When good cause is shown, "less weight, little weight or even no

weight may be given to a [physician's opinion.]" *Greenspan v. Shalala,* 38 F.3d 232, 237

(5th Cir. 1994).  The ALJ is also free to reject the opinions of a treating physician when

the evidence supports a contrary conclusion.

### a.  Dr. Schneider

For the reasons already explained, the ALJ had good cause to assign reduced

weight to Dr. Schneider's opinions, particularly his finding that she is entitled to

disability benefits because she is 100% "permanently occupationally disabled" and

"cannot work in any setting."  The ALJ is solely responsible for determining disability.

Still, Plaintiff argues the ALJ improperly rejected Dr. Schneider's opinions based upon

her work history.  She maintains again that she was afforded special accommodations at

Subway and that the ALJ should have investigated whether her other employers did as

well.  She also asserts that the ALJ was wrong to find that there was no evidence that her

mental capacity deteriorated after she stopped working at Subway.  As noted above,

Plaintiff's Subway employer expressly states that he did not provide Plaintiff with any

16

"special accommodations." Also, because she was last employed at Subway, contacting

her previous employers to determine whether her condition worsened after she stopped

working there would have been futile. Moreover, Plaintiff bears the burden of securing

evidence of disability, not the Commissioner. *See Thorton v. Schweiker*, 663 F.2d 1312,

1316 (5ᵗʰ Cir. 1981). Plaintiff has also failed to produce any evidence that she has ever

been fired or quit a job because her mental condition prevented her from performing her

work-related functions.

### b. Dr. Witcher

Plaintiff also contends that the ALJ erred in finding that Dr. Witcher's residual

functional capacity assessment was based on subjective complaints. In support, she states

that Dr. Witcher referred her to pain management, but she failed to respond. This

argument is without merit. As the ALJ observed, though Plaintiff "sought medical

treatment with a routine frequency," she had not "undergone extensive diagnostic studies,

but rather [had] been to multiple physicians, who each appear to have relied on diagnostic

studies conducted elsewhere, as noted by Dr. Witcher."[28] In fact, the two MRI's – the

only diagnostic studies of record – were both normal. Also, Dr. Witcher's assessment

contains brief conclusory statements, and as noted by the ALJ, "[i]n reporting what

medical findings supported these conclusions, he responded 'Refer to UMC pain

---

[28]ECF No. 9-2, p. 20.

specialist medical records.'"[29]  Plaintiff submits that Dr. Witcher simply meant that he had utilized the information which he received from other specialists to formulate his opinions.  Even so, Plaintiff's back pain was "good" by June 2007, and contrary to her claims, records from the UMC Pain Management Clinic show that she responded well to steroid injections.  When her pain returned, she went back for another injection and her last clinic visit was in April 2007.  Also, in his review of the medical evidence, state agency consultant Dr. Jeffcoat noted that medical findings were exaggerated.  The record does not establish that Plaintiff's physical impairments produced the extreme functional limitations reported by Dr. Witcher.  Thus, in light of the objective medical evidence, it was reasonable for the ALJ to conclude that the functional limitations, "as described by Dr. Witcher appear to be based on the claimant's subjective complaints, rather than abnormalities established by medically acceptable, clinical and laboratory diagnostic techniques, as required for a finding of disability under the Social Security Act."[30]

In sum, the ALJ had good cause to assign reduced weight to the opinions of both Dr. Schneider and Dr. Witcher.  Though Plaintiff contends the evidence suggests otherwise, substantial evidence supports the Commissioner's decision.  This Court may not re-weigh the evidence, try the case *de novo*, or substitute its judgment for that of the ALJ.

---

[29] ECF No. 9-2, p. 16.

[30] *Id.*

**3.     The ALJ's residual functional capacity assessment is supported by substantial evidence.**

At step four, the ALJ found that Plaintiff could not return to her past relevant work, but has the residual functional capacity to perform light work: "limited by her inability to perform more than occasional stooping or bending, her inability to be exposed to temperature extremes or work hazards such as dangerous machinery or unprotected heights, and her inability to remember and carry out more than simple instructions."[31] Plaintiff argues that this assessment fails to include her obesity and moderate limitations in maintaining concentration, persistence and pace, in violation of Social Security Rulings 96-8p.

SSR 96-8p provides that residual functional capacity is a function-by-function assessment of an individual's ability to do sustained work activities on a regular and continual basis.  1996 WL 374184, at *1, 3.  The assessment "considers only functional limitations and restrictions that result from an individual's medical impairment or combination of impairments." *Id.* at *1.  SSR 96-8p also provides that: "When there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation of restriction, the [ALJ] must consider the individual to have no limitation or restriction with respect to that functional capacity." *Id.*  The Court finds no evidence that Plaintiff's

-----

[31]ECF No. 9-2, p. 19.

impairment produces limitations beyond those incorporated into the ALJ's residual

functional capacity assessment.

Though Plaintiff was diagnosed with depression and mild mental retardation, the

Court finds no objective medical evidence that either impairment produced limitations

that impeded her ability to work.  During Dr. Shackelford's exam, Plaintiff reported

trouble sleeping, but denied depression and anxiety.  She was otherwise fully oriented

and appeared to have situational worries, but only with regard to her physical

limitations.[32]  Dr. Schneider also attributed Plaintiff's depression to her physical

limitations and lower back pain.[33]  Plaintiff herself also repeatedly identified her

sacroiliac and arthritis pain as the reasons preventing her from work.[34]  Also, at her

administrative hearing, she did not testify that her mental impairments limited her in any

way.  Her testimony solely focused on the physical limitations caused by her arthritis and

lower pack pain.  The ALJ observed further that Plaintiff went "about the community

unaided," drove, cooked, shopped, and was able to maintain her home and raise her

children.[35]  Her mental impairments produced only mild restrictions in daily living and

social functioning, and there was no evidence that she ever experienced episodes of

---

[32]ECF No. 9-7, p. 66.

[33]ECF No. 9-8, p. 3.

[34]ECF No. 9-6, p. 6.

[35]ECF No. 9-2, p.18.

decompensation of extended duration.

The ALJ found that Plaintiff had moderate difficulties in maintaining concentration, persistence and pace, but Plaintiff submits these were omitted from the residual functional capacity assessment.  The Court notes that the ALJ expressly observed that:  "While the claimants's decreased I. Q. scores may limit the claimant to routine, repetitive, simple tasks, it is noted she has demonstrated the capacity to maintain concentration, persistence and pace adequately to perform her past work, drive, and perform simple, routine tasks."[36]  And though no credible evidence was ever produced that her mental capacity worsened after she stopped working, in an apparent abundance of caution, the ALJ found she could not return to her past relevant work because it "required exertion and, or other activities beyond [her] current residual functional capacity."[37]  The ALJ then went on to find that Plaintiff's residual functional capacity was limited to simple instructions, which was a reasonable incorporation of her moderate limitations in concentration, persistence, and pace.  *Bordelon v. Astrue*, 281 Fed.Appx. 418 (5th Cir. 2008) (unpublished) ("restrictions to rare public interaction, low stress, and one-to-two step instructions" reflect that the ALJ reasonably incorporated the plaintiff's moderate concentration, persistence and pace limitations).

---

[36]*Id.*

[37]ECF No. 9-2, p. 21.

Plaintiff also claims that remand is warranted because the ALJ failed to consider the limiting effects of her obesity in accordance with Social Security Ruling 02-1p. Social Security Ruling 02-1p provides that obesity can cause physical functional limitations with regard to "sitting, standing, walking, lifting, carrying, pushing, pulling, climbing, balancing, stooping, crouching, manipulating, as well as the ability to tolerate extreme heat, humidity, or hazards." SSR 02-1p. The ALJ's residual functional capacity assessment in this case limited Plaintiff to no more than occasional stooping or bending and limited her exposure to extreme temperatures. Neither the objective medical evidence nor Plaintiff's testimony indicates that her obesity produced functional limitations beyond those described. Though the ALJ considered the impairment severe, the "mere presence of some impairment is not disabling per se." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983). The impairment must create a functional limitation that affects the claimant's ability to work. *Id.* To the extent Plaintiff's obesity created functional limitations in this case, they are reflected in the ALJ's residual functional capacity assessment.

In sum, the ALJ considered the entire record and properly performed the requisite analysis mandated by the applicable listings and SSR 96-8p. *See Porter v. Barnhart*, 200 Fed.Appx. 317 (5th Cir. 2006) (unpublished) (finding compliance with SSR 96-8P when the ALJ considers the record as a whole). Substantial evidence supports the ALJ's findings and they will not be disturbed here.

**4.      The ALJ properly relied on the vocational expert's testimony.**

In her final assignment of error, Plaintiff argues the ALJ erred at step five because she relied on the vocational expert's recommendation that she could perform unskilled jobs that have a higher reasoning level than those provided in the Dictionary of Occupational Titles.  According to the DOT, a General Educational Development ("GED") Reasoning Level of 3 requires employees to "[a]pply commonsense understanding to carry out instructions furnished in written, oral or diagrammatic form [and to d]eal with problems involving several concrete variable in or from standardized situations."  Dictionary of Occupational Titles Appendix C- Components of the Definition Trailer, 1991 WL 688702.  A GED Reasoning Level of 2 requires employees to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions [and to d]eal with problems involving a few concrete variables in or from standardized situations." *Id.*  A GED Reasoning Level of 1 requires claimants to "[a]pply commonsense understanding to carry out simple one-or two-step instructions [and to d]eal with standardized situations encountered on the job." *Id*.  Plaintiff argues that the ALJ committed reversible error because her residual functional capacity assessment limits her to unskilled work, which carries a Reasoning Level of 1, but the jobs identified by the vocational expert, such as assembler, house sitter, or silver wrapper, all have reasoning levels higher than 1.

The Fifth Circuit "has recognized that the DOT is not comprehensive, in that it cannot and does not purport to include each and every specific skill or qualification for a particular job." *Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000) (internal citations omitted).  Unlike the DOT, which gives only general descriptions of job duties, a "vocational expert is able to compare all the unique requirements of a specified job with the particular ailments a claimant suffers in order to reach a reasoned conclusion whether the claimant can perform the specific job." *Fields v. Bowen,* 805 F.2d 1168, 1170-71 (5th Cir. 1986).  In *Carey*, the Fifth Circuit explained that:

> To the extent that there is any implied or indirect conflict between the vocational expert's testimony and the DOT. . . , we agree with the majority of circuits that the ALJ may rely upon the vocational expert's testimony provided that the record reflects an adequate basis for doing so. . . [A]ll kinds of implicit conflicts are possible and the categorical requirements listed in the DOT do not and cannot satisfactorily answer every such situation. . . . Adopting a middle ground approach, in which neither the DOT nor the vocational expert testimony is per se controlling, permits a more straightforward approach to the pertinent issue, which is whether there is substantial evidence supporting the Commissioner's determination that this particular person can do this particular job or group of jobs.

230 F.3d at 146-47.

Thus, the determinative issue is not whether the vocational expert's testimony and the DOT conflict, but whether substantial evidence supports the ALJ's finding that she can return to unskilled work.  Substantial evidence exists here.  Plaintiff's past relevant work as a fast food worker, welder/production line worker, sewing machine operator, and waitress, were both unskilled and semi-skilled work according to the DOT.[38]  All of the

---

[38]ECF No. 9-2, p. 62.

jobs identified by the vocational expert are unskilled, and no credible record evidence shows that Plaintiff's mental capacity has deteriorated since she stopped working.  No remand is warranted on this issue.

Based upon consideration of the evidentiary record as a whole, the ALJ determined that Plaintiff failed to establish that her impairments were of sufficient severity to be disabling.  The undersigned's review of the record compels a finding that the ALJ applied the correct legal standard and that substantial evidence supports the ALJ's decision.

## Conclusion

For all the above reasons, it is the opinion of the undersigned United States Magistrate Judge that Plaintiff's Motion for Summary Judgment be denied; that Defendant's Motion to Affirm the Commissioner's Decision be granted; that Plaintiff's appeal be dismissed with prejudice; and, that Final Judgment in favor of the Commissioner be entered.  The parties are hereby notified that failure to file written objections to the proposed findings, conclusions, and recommendation contained within this report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  28 U.S.C. § 636, Fed. R.  Civ. P. 72(b) (as amended, effective December 1, 2009).

This the 15th day of August 2011.

/s/ Linda R. Anderson
UNITED STATES MAGISTRATE JUDGE